IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DANIEL J. RENDER, | ) | 8:12CV438 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of the | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Daniel J. Render, brings this suit to challenge the Social Security Commissioner's final administrative decision denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.[1] For the reasons discussed below, the Commissioner's decision will be affirmed.

## I.  PROCEDURAL BACKGROUND

Plaintiff is a 56-year-old man who has a high school education and work experience in construction.  He claims to have been disabled since July 10, 2009, due to multiple sclerosis.

Plaintiff's application for disability insurance benefits was denied initially on November 12, 2009 (Transcript ("Tr.") (CM/ECF filing 9) 90). The application was also denied on reconsideration, on May 25, 2010, with the Commissioner explaining that "while [Plaintiff] may not be able to engage in past work activities, the records indicate that [he is] capable of other types of work activities ... that are light in nature" (Tr. 95).

_____

[1] Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's final administrative decision under Title II.

Following these denials, Plaintiff filed a request for an administrative hearing (Tr. 99-100). Kathleen Muramoto, an administrative law judge ("ALJ"), conducted a hearing on March 16, 2011, in Omaha, Nebraska (Tr. 24-79). Plaintiff, who waived representation, testified at the hearing. A vocational expert also provided testimony.

The ALJ issued an unfavorable decision on April 6, 2011, concluding that although Plaintiff is unable to perform any past relevant work, he is not disabled. Using the 5-step sequential analysis prescribed by Social Security regulations,[2] the ALJ made the following findings:

**1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.**

**2. The claimant has not engaged in substantial gainful activity since July 10, 2009, the alleged onset date (20 CFR 404.1571 *et seq*.).**

The claimant worked after the alleged disability onset date but this work activity did not rise to the level of substantial gainful activity. (Exhibits

---

[2]  The Eighth Circuit has described the procedure as follows:

At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ("RFC")] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

-2-

4D, 6D-10D, and 1E) Additionally, the claimant reported that he received short-term disability for approximately 6 months and unemployment for approximately 9 months. (Exhibit 11E/3)

**3. The claimant has the following severe impairment: multiple sclerosis (20 CFR 404.1520(c)).**

\*\*\*

Additionally, there is evidence in record that the claimant has experienced some problems with his vision and also has hypertension. However, the claimant has not had any significant complaints or significant treatment for these conditions. (1F-5F, 8F, 18F, and 20F) Moreover, at the hearing, when given an opportunity to testify about the limiting effects that these conditions placed on him, the claimant did not do so. Furthermore, there was essentially no evidence in the record to suggest that these conditions would place limitations on the claimant's ability to perform basic-work related activities.

\*\*\*

**4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).**

\*\*\*

**5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except as follows:**

**The claimant can occasionally climb and balance. He must avoid concentrated exposure to hazards such as machinery and heights.**

\*\*\*

-3-

At the hearing, the claimant testified that his multiple sclerosis prevents him from being able to work. He said that the last time he saw his neurologist at the University of Nebraska Medical Center for this condition was 2 to 3 months ago. According to the claimant, his neurologist wants to see him more frequently but he has not been able to do so because he does not have insurance.

The claimant stated that he takes Rebif injections every other day to treat his multiple sclerosis, high blood pressure medications, and over-the-counter pain medications (Excedrin and Bayer). Additionally, he indicated that he experiences side effects as a result of taking Rebif. Moreover, he said that approximately once a month his side effects are so severe that he is not able to leave his home for three days (though this was getting better). In addition, the claimant stated that since taking Rebif he has been able to walk and his bad symptoms have not returned. He did, however, report that at times his body still aches, he has trouble using parts of his body, and also has difficulty sleeping. He further indicated that his current neurologist has never outright said he could not work.

Functionally, the claimant said that he was only able to sit for 1 hour, and stand for 1 hour. Additionally, he said that if he walked 100 yards, it would take him 30 minutes to recover. He also indicated that if he works too hard or does too much he has trouble with his vision. According to the claimant, he could lift 100 pounds, but could not carry it. At times, he stated that he experiences difficulty using his hands.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

The objective medical evidence in record shows the claimant's history and treatment for his severe impairment. (Exhibits 1F-4F, 9F, 11F, 15F, 17F, and 19F-20F) In July 2009, the claimant was hospitalized at Bergan Mercy Medical Center where it was reported that he had progressive

weakness with demyelinating findings on an MRI of the brain (multiple sclerosis); hypertension; and a history of venous sinus thrombosis. (Exhibits 1F/25, and 1F/21 *also see* Exhibit 15F)

Following his hospitalization, the claimant received treatment for his physical impairment at Alegent Health Clinic. (Exhibit 2F) He later began receiving treatment from Dr. Edward Schima, a neurologist, who prescribed him Rebif to manage his multiple sclerosis. (Exhibits 3F- 4F, and 19F)

The record is essentially void of any treatment the claimant received for his severe physical impairment from September 2009 until January 2010 when he began receiving treatment from Creighton University Medical Center Department of Neurology. (Exhibits 9F, 11F, and 17F)

Treatment notes from Creighton University Medical Center Department of Neurology from April 2010 indicate that the claimant had not experienced any relapses. (Exhibit 11F/6) Moreover, in September 2010, it was revealed that the claimant's motor strength was 5/5 in all proximal and distal muscle groups tested; and that his muscle tone and bulk were normal. (Exhibit 17F/6) At that time, it was also noted that the claimant had been doing "very well." (Exhibit 17F/5)

Following the claimant's office visit at Creighton University Medical Center Department of Neurology in September 2010, there was no indication in the record that the claimant has received any other follow-up care, or required any emergency room treatment, or hospitalizations for his multiple sclerosis.

As for the opinion evidence, in October 2009, Dr. Schima reported that the claimant had severe impairment of gait which would prevent him from engaging in any activity that involved walking, handling objects, working at heights, or lifting. He also opined that the claimant was not able to work. (Exhibit 4F/2) First, although Dr. Schima is an acceptable medical source and treating source, his opinions and reports are quite conclusory as he provided very little explanation regarding the information he relied on in forming his opinions. Moreover, his opinions and reports contrast sharply with other substantial evidence in record

-5-

which renders them less persuasive. Lastly, even the claimant through his own self-reports has not described limitations with respect to his ability to walk, handle objects, work at heights, or lift that are as narrow as those described by Dr. Schima. For all of the foregoing reasons, the opinions and reports of Dr. Schima are not given great weight.

Pursuant to SSR 96-6p, the State agency medical consultants' physical assessments are afforded great weight because they are generally consistent with other substantial evidence in record. (Exhibits 6F, and 13F)

The claimant is not a fully credible witness. At the hearing, the claimant testified that he was not able to see his neurologist as frequently as she would like to see him because he does not have any insurance. However, the record (along with his testimony) indicates that he was able to support his tobacco use of approximately one-half a pack a day along with his alcohol use of a couple beers every three days. (Exhibit 17F/5) Additionally, there was no indication in the record that the claimant attempted to obtain a Medical Assistance card so that he could obtain such medical care. Moreover, the claimant testified that sometimes he experiences pain in his right leg for 2 weeks that make it difficult for him to walk, however, there is no indication in the record that he has ever sought treatment at a free clinic or emergency room when this has occurred. Furthermore, the claimant offered testimony indicating that when he takes medications such as over-the-counter Excedrin and Bayer it works to alleviate his pain.

In his statements of record submitted to the Social Security Administration (and in his testimony), the claimant reported various activities that he could engage in such as maintain his personal hygiene; go out to his shop to perform odd jobs; exercise; make his own meals; perform some house work; do some yard work; drive an automobile; go to the store or to visit friends a few times a week; visit with his girlfriend's mother; feed his dog; watch television; and play chess online. (Exhibit 5E) The activities that the claimant indicated that he could engage in are not limited to the extent one would expect from a disabled person. Additionally, the claimant testified that he went on vacation with his son in 2010. Although a vacation and a disability are

-6-

not necessarily mutually exclusive, the claimant's decision to go on a vacation tends to suggest that the alleged symptoms and limitations may have been overstated. Moreover, when looking at the overall record, the severity of the claimant's symptoms are vastly inconsistent with the objective medical evidence. Furthermore, although the claimant reported that his medication (Rebif) caused him to experience significant side effects, the record is essentially void of any indication that that [*sic*] these side effects placed any significant limitations on the claimant's daily activities, on his ability to take a vacation, or that they would limit him in his ability to work. Lastly, by his own admission, the claimant testified that his current neurologist has never outright said he could not work.

In sum, based on the total record, the claimant's symptoms and impairments are not as severe as alleged and the undersigned has not given great weight to the claimant's implicit allegation that he is unable to engage in any and all kinds of full-time, competitive, gainful employment on a sustained basis.

**6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).**

The claimant has past relevant work as a construction worker (DOT 869.664-0 14) which the Dictionary of Occupational Titles classifies as semi-skilled (SVP 4) and heavy work. In view of the claimant's past relevant work, the claimant is precluded from performing this position due to exertional level. Accordingly, the claimant is unable to perform past relevant work.

**7. The claimant was ... was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).**

**8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).**

**9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a**

**framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).**

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).**

\*\*\*

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would he directed by Medical-Vocational Rule 202.14. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a production assembler (706.687-010) which is unskilled (SVP 2) and light work with 4,110 positions in the four state region (Nebraska, Iowa, Kansas, and Missouri) and 82,104 positions in the United States of America; and a cashier II (DOT 211.462-010) which is unskilled (SVP 2) and light work with 54,295 positions in the four state region (Nebraska, Iowa, Kansas, and Missouri) and 1,114,950 positions in the United States of America.

Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant

numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

**11. The claimant has not been under a disability, as defined in the Social Security Act, from July 10, 2009 through the date of this decision (20 CFR 404.1520(g)).**

(Tr. 12-18 (bold-face type and other emphasis in original)).

Plaintiff requested review of the ALJ's decision by the Appeals Council (Tr. 6). The request was denied on October 21, 2012 (Tr. 1-3). The ALJ's decision thereupon became the final decision of the Commissioner. *See Van Vickle v. Astrue,* 539 F.3d 825, 828 (8th Cir. 2008). Plaintiff filed this action on December 21, 2012. The filing was timely under 42 U.S.C. § 405(g).

## II. ISSUES

Plaintiff contends "[t]he ALJ's opinion is not supported by substantial evidence because the ALJ did not properly evaluate the medical record for the following reasons: [1] The ALJ did not afford proper weight to the opinion of Plaintiff's treating neurologist, Dr. Schima; [2] the ALJ did not evaluate the medical records of Plaintiff's treating neurologist, Dr. Bremer, and improperly relied upon her lack of opinion to conclude Plaintiff was not disabled; and [3] the ALJ improperly assigned too much weight to the opinions of the non-examining state agency doctors" (filing 14 at 7). Plaintiff further contends "[t]he ALJ's RFC assessment is not supported by substantial evidence because the ALJ erroneously excluded Plaintiff's subjective limitations such as fatigue and weakness, as well as the side effects of his medication" (filing 14 at 18). In conclusion, Plaintiff claims "[t]he ALJ's finding that Plaintiff could perform other work in the national economy is not supported by substantial evidence because it was elicited by testimony from the vocational expert that did not accurately reflect Plaintiff's impairments" (filing 14 at 8).

-9-

### III. DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n. 2 (8th Cir. 1995).

### A. Medical Evidence

On July 16, 2009, Plaintiff went to the Alegent Health Clinic for a medication checkup (Tr. 286). He reported a tingling sensation in his left arm and leg (Tr. 286). An examiner noted that Plaintiff had been diagnosed with cerebral venous sinus thrombosis, and was taking an anti-coagulant (Tr. 286). The examiner also noted that a previous magnetic resonance imaging (MRI) scan of Plaintiff's brain had revealed possible multiple sclerosis (Tr. 286). The examiner ordered an updated MRI, which showed some new white-matter lesions (Tr. 259, 287).

On July 20, 2009, Plaintiff went to the Bergan Mercy Medical Center with complaints of left-sided weakness and numbness (Tr. 272). Austin Rivett, D.O., referred Plaintiff to a neurologist and ordered MRIs of Plaintiff's spine (Tr. 274). Later that day, Plaintiff saw Edward Schima, M.D., a neurologist at the hospital (Tr. 269). Dr. Schima noted that Plaintiff's recent MRI showed white-matter lesions suggesting demyelinating disease (Tr. 269). During his examination, Plaintiff had some abnormalities in terms of cranial nerves, walked with a left-sided limp, and showed fine-motor weakness (Tr. 270). However, Plaintiff had intact reflexes and

-10-

sensation (Tr. 270). Dr. Schima diagnosed multiple sclerosis, thrombosis by history, and hypertension (Tr. 270). He agreed that MRI studies were needed (Tr. 271).

A MRI of Plaintiff's cervical spine showed spondylosis with no significant compromise of the spinal cord (Tr. 261). A MRI of his thoracic spine showed a "tiny" disc protrusion that did not result in significant stenosis (Tr. 263-64), while a MRI of his lumbar spine showed multilevel spondylosis and facet arthropathy without compromise of the spinal cord (Tr. 266).

Plaintiff returned to the Alegent Health Clinic on July 30, 2009 (Tr. 282). Plaintiff reported increased strength following his discharge from the hospital about one week earlier (Tr. 282). Because Plaintiff's blood pressure remained high, he received new blood-pressure medication (Tr. 283).

Plaintiff saw Dr. Schima again on August 13, 2009 (Tr. 303). Dr. Schima observed that Plaintiff walked with a slight limp, and could walk on his heels and toes, but found it difficult to hop (Tr. 303). Dr. Schima gave Plaintiff an injection of a pain medication (Tr. 303).

During a follow-up appointment on August 27, 2009, Plaintiff reported severe fatigue (Tr. 303). Dr. Schima prescribed anti-fatigue medication (Tr. 303). After Plaintiff reported on September 3 that he had stopped taking the new medication because of insomnia, Dr. Schima reduced the dosage (Tr. 303).

On September 16, 2009, Plaintiff reported ongoing problems with walking as well as tunnel vision (Tr. 312). Dr. Schima prescribed Rebif and referred Plaintiff to an ophthalmologist, Robert Vandervort, O.D. (Tr. 312, 316-317).

When Plaintiff saw Dr. Vandervort on September 22, 2009, he reported blurred vision and irritation in his eyes (Tr. 316). Dr. Vandervort noted that Plaintiff's medical history included a corneal abrasion in his right eye in 2004 (Tr. 316). After examining

Plaintiff, Dr. Vandervort diagnosed visual field defects consistent with old optic neuritis, as well as dry-eye syndrome (Tr. 317). He prescribed eye drops and planned to see Plaintiff again in three months (Tr. 317).

On October 14, 2009, Dr. Schima wrote a letter to the Social Security Administration in support of Plaintiff's disability claim.  He stated in the letter:

> [Plaintiff] is still troubled with severe gait difficulties, severe fatigue and visual blurring secondary to optic neuritis. His examination reveals severe impairment of gait which would clearly prevent him from engaging in any activity that involved walking, handling objects, working at heights or lifting. He has also had pervasive severe fatigue and the relentless progression of symptoms since his initial evaluation on July 20th suggests that he may have a primary progressive variant to the disease and this may sometimes herald a poor prognosis. I do not believe he will be able to return to work.

(Tr. 308).

Dr. Schima saw Plaintiff again on October 16, 2009 (Tr. 431). Plaintiff denied any improvement in his fatigue (Tr. 431). Dr. Schima noted that Plaintiff "walked briskly on a normal base" and could walk on his toes and heels, but could not hop (Tr. 431). Finger-to-nose and heel-to-knee movements were normal (Tr. 431). Plaintiff had normal muscle strength, except for "5/5-" strength during thigh flexion (Tr. 431). Dr. Schima continued Plaintiff's Rebif treatment and increased his dosage of anti-fatigue medication (Tr. 431).

On November 10, 2009, Glenn Knosp, M.D., an agency non-examining physician, completed a physical assessment of Plaintiff based on the record (Tr. 318-325). Dr. Knosp felt that Plaintiff could lift and carry up to twenty pounds occasionally and up to ten pounds frequently (Tr. 319). He thought Plaintiff could stand or walk for up to six hours and sit for up to six hours in an eight-hour workday (Tr. 319). In terms of postural limitations, Dr. Knosp believed Plaintiff could

-12-

occasionally balance or climb ramps or stairs (Tr. 320). In terms of environmental limitations, Dr. Knosp felt Plaintiff should avoid concentrated exposure to extreme temperatures and wetness (Tr. 322).

On December 14, 2009, Dr. Schima noted that Plaintiff's wife had called one of his nurses and "used expletives" about a paperwork issue (Tr. 430). Dr. Schima told Plaintiff's wife that he would forward Plaintiff's records to a new neurologist of Plaintiff's choosing (Tr. 430).

Dr. Vandervort saw Plaintiff for a second eye examination on December 18, 2009 (Tr. 332-333). Plaintiff reported that his vision was good (Tr. 332). Dr. Vandervort planned to see him for a reassessment in one year (Tr. 333).

Plaintiff saw Dr. Rivett again at the Alegent Health Clinic on January 7, 2010 (Tr. 457). Plaintiff complained of side effects from Rebif, including pain and fatigue (Tr. 457). During his exam, Dr. Rivett noted that Plaintiff had "acceptable" blood pressure, intact cranial nerves, and diminished leg strength (Tr. 457). He advised Plaintiff to begin taking aspirin (Tr. 457).

Later that same day, Plaintiff saw Karen Bremer, M.D., a neurologist at the Creighton University Medical Center, on referral from Dr. Rivett (Tr. 340-342). During Dr. Bremer's examination, Plaintiff had normal cranial-nerve functioning, intact motor strength, and normal muscle tone (Tr. 341). However, he showed some ataxia and had reduced reflexes (Tr. 341). Dr. Bremer ordered liver-function studies, which were normal (Tr. 342). She diagnosed multiple sclerosis that was stable on Rebif treatment (Tr. 342). Dr. Bremer advised Plaintiff to take aspirin to mitigate Rebif's "flu like" side effects (Tr. 342).

Plaintiff saw Dr. Rivett again on April 15, 2010 (Tr. 441-442). Plaintiff complained that he began experiencing left shoulder pain about five days earlier, although the pain subsequently improved (Tr. 441). Dr. Rivett noted that Plaintiff had

atrophy in his left shoulder because of an old injury (Tr. 441). Dr. Rivett diagnosed a muscle strain that had resolved (Tr. 442). He gave Plaintiff a prescription for a muscle relaxant that might help if the pain returned (Tr. 442).

Dr. Bremer saw Plaintiff again on April 19, 2010 (Tr. 352-353). Plaintiff complained of nausea and vomiting as well as left shoulder pain (Tr. 352, 353). Dr. Bremer observed atrophy in Plaintiff's left shoulder (Tr. 352). She noted Plaintiff would continue taking Rebif (Tr. 353).

Plaintiff returned to Dr. Rivett on May 12, 2010, for a routine physical examination (Tr. 437-440). Plaintiff reported off-and-on pain in his groin and right hip, as well as heartburn, acid reflux, and vomiting (Tr. 437). During Dr. Rivett's neurologic exam, Plaintiff had no sensory loss, no motor weakness, and preserved deep-tendon reflexes (Tr. 438). X-rays of Plaintiff's right hip appeared normal (Tr. 439, 452). Dr. Rivett prescribed medication for Plaintiff's reflux and pain medication for his hip (Tr. 439).

Steven Higgins, M.D., a second state agency non-examining physician, completed an updated physical assessment based on the record on May 24, 2010 (Tr. 358-366). Plaintiff's impairments included multiple sclerosis, hypertension, and optic neuritis (Tr. 358). Dr. Higgins felt that Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently, and could stand and walk for about six hours or sit for about six hours in an eight-hour workday (Tr. 359). He thought Plaintiff could only occasionally balance or climb ramps or stairs (Tr. 360). In terms of environmental limitations, Dr. Higgins felt that Plaintiff should avoid concentrated exposure to hazards (Tr. 362).

During a September 14, 2010, neurology appointment with Dr. Bremer, Plaintiff said he was doing very well, with no definite exacerbations of his multiple sclerosis (Tr. 410). However, Plaintiff complained of nausea spells that occurred every four to five weeks (Tr. 410). Plaintiff also reported constipation, high blood pressure,

fatigue, and sleep difficulties (Tr. 410). Dr. Bremer observed that Plaintiff spoke with pressured speech but had full motor strength and normal muscle tone (Tr. 410-411). Finger-to-nose testing and heel-to-shin testing was relatively normal, although Plaintiff complained that his movements were not as precise as they used to be (Tr. 411). During testing, Plaintiff had brisk reflexes (Tr. 411). Dr. Bremer continued Plaintiff's prescription for Rebif, ordered liver studies and blood work, and recommended stool softener or fiber supplements (Tr. 411).

### 1. Dr. Schima

Dr. Schima is a treating neurologist who saw Plaintiff on 5 occasions during a 2-month period (on 7/20/09, 8/13/09, 8/27/09, 9/3/09, and 9/16/09) before sending his records to the Social Security Administration and opining that Plaintiff had "severe impairment of gait which would clearly prevent him from engaging in any activity that involved walking, handling objects, working at heights or lifting" and "also had pervasive severe fatigue" (Tr. 308).[3] "[T]he opinions and reports of Dr. Schima [were] not given great weight" by the ALJ (Tr. 15).

The ALJ found Dr. Schima's opinions and reports to be "quite conclusory as he provided very little explanation regarding the information he relied on in forming his opinions" (Tr. 15). The ALJ also stated, without elaboration, that Dr. Schima's

---

[3] Dr. Schima concluded by stating he did "not believe [Plaintiff] will be able to return to work" (Tr. 308). "Though a treating doctor's opinion that the claimant cannot return to work, combined with other medical information, may assist an ALJ [in] determining whether a claimant is disabled, such an opinion cannot resolve the issue." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009) (quoting *Samons v. Astrue*, 497 F.3d 813, 819 (8th Cir.2007)). "[A] treating physician's opinion that a claimant is not able to return to work 'involves an issue reserved for the Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight.'" *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005) (quoting *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005)).

"opinions and reports contrast sharply with other substantial evidence in record which renders them less persuasive" (Tr. 15). In addition, the ALJ noted that Plaintiff had not reported "limitations with respect to his ability to walk, handle objects, work at heights, or lift that are as narrow as those described by Dr. Schima" (Tr. 15).

Plaintiff contends Dr. Schima's opinions should have been given controlling weight by the ALJ. *See* 20 C.F.R. §§ 404.1527(c)(2) ("If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight."); *see also* Social Security Ruling 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996) ("In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.").

Dr. Schima's treatment notes do not support his opinion that Plaintiff has "severe impairment of gait which would clearly prevent him from engaging in any activity that involved walking, handling objects, working at heights or lifting" (Tr. 308). Dr. Schima saw Plaintiff only 5 times during a 3-month period in 2009. At the first examination, on July 20, 2009, it was noted that Plaintiff "walk[ed] briskly but tend[ed] to circumduct the left leg" (Tr. 270). At the next visit, on August 13, 2009, Plaintiff again "walk[ed] briskly but there [was] still a tendency to circumduct the left leg" (Tr. 303). "He [could] walk on his toes and heels but hopping was impaired with the left foot" (Tr. 303). Two weeks later, Plaintiff again "walked briskly but tend[ed] to favor the left leg" (Tr. 303). On September 16, 2009, Dr. Schima noted that Plaintiff "walk[ed] briskly on a slightly widened base" (Tr. 312). "There [was] impairment of toe walking ... and heel walking ... [and] difficulty hopping" (Tr. 312). On Plaintiff's fifth and final visit to Dr. Schima, on October 16, 2009, he "walked briskly on a normal base and [could] walk on his toes and heels but was unable to hop on either foot" (Tr. 431). The ALJ did not err by discounting Dr. Schima's opinion

-16-

as conclusory. *See Anderson v. Astrue*, 696 F.3d 790, 794 (8th Cir. 2012) (significant limitations treating physician expressed in his evaluation of claimant were not reflected in any treatment notes or medical records).

### 2. Dr. Bremer

Plaintiff complains that the ALJ twice mentioned that "his current neurologist [Dr. Bremer] has never outright said he could not work" (Tr. 14, 16).[4] "A treating doctor's silence on the claimant's work capacity does not constitute substantial evidence supporting an ALJ's functional capacity determination when the doctor was not asked to express an opinion on the matter and did not do so, particularly when that doctor did not discharge the claimant from treatment." *Hutsell v. Massanari*, 259 F.3d 707, 712 (8th Cir. 2001). As will be discussed later, however, there is other evidence, including the opinions of state agency medical consultants, that provides adequate support for the ALJ's assessment of Plaintiff's RFC.

Although Plaintiff suggests that the ALJ was required to contact Dr. Bremer for an opinion, the duty to "fully and fairly develop the record" concerning a claimant's limitations only exists where the professional opinions available are not sufficient to allow the ALJ to form an opinion. *See Tellez v. Barnhart*, 403 F.3d 953, 956-57 (8th Cir. 2005); *see also Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004) (holding that the ALJ does not need to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped). "Ultimately, the claimant bears the burden of proving disability and providing medical evidence as to the existence and severity of an impairment." *Kamann v. Colvin*, 721 F.3d 945, 950 (8th Cir. 2013)

---

[4] During the hearing, the ALJ asked Plaintiff what Dr. Bremer said about any limitations on his ability to work. Plaintiff responded, "Well, her, herself, she hasn't. I don't think she has. I'm not sure she said well you can't work, but she—she asked, you know, well I can't work. I mean she has really–yeah, I don't think she's told me. She's never—nobody's told me you just point blank can't work." (Tr. 45).

-17-

(citing *Snead v. Barnhart*, 360 F.3d 834, 836 (8th Cir.2004)). Past this point, "an ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision." *Id.* (quoting *Naber v. Shalala*, 22 F.3d 186, 189 (8th Cir. 1994)).

Plaintiff also contends the ALJ failed to evaluate Dr. Bremer's medical records. This is incorrect. Plaintiff saw Dr. Bremer only 3 times, and the ALJ discussed two of these visits in her decision.[5]  The ALJ was not required to list all of the symptoms that Plaintiff reported to Dr. Bremer.[6]  "Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (quoting *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998)). "Moreover, '[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered.'" *Id.* (quoting *Black*).

---

[5] After observing that Plaintiff began receiving treatment from Creighton University Medical Center Department of Neurology in January 2010, the ALJ stated that "[t]reatment notes ... from April 2010 indicate that the claimant had not experienced any relapses. (Exhibit 11F/6)" (Tr. 15). The ALJ further stated: "[I]n September 2010, it was revealed that the claimant's motor strength was 5/5 in all proximal and distal muscle groups tested; and that his muscle tone and bulk were normal. (Exhibit 17F/6) At that time, it was also noted that the claimant had been doing 'very well.' (Exhibit 17F/5)" (Tr. 15).

[6] Plaintiff asserts that "the ALJ failed to consider statements from Dr. Bremer such as: He continues to have nonspecific abdominal syndrome about every four to five weeks, where he gets 'terrible sick' [sic.] characterized by increased nausea, stomach pain radiating up into the chest, inability to eat except for drinking water and soda pop, followed by emesis. These spells usually last two to three days. He also has abdominal pain and nausea…Review of 14 systems is remarkable for headache, dizziness, altered vision. He has to wear eyeglasses for near vision. He has high blood pressure, chronic abdominal pain, nausea, and constipation. He has difficulty walking, clumsiness, feels like there is almost a sprain in his foot when he walks sometimes. He has chronic fatigue, but also difficulty sleeping. He has lost some weight and feels depressed. (Tr. at 410-411.)" (filing 20 at 8-9).

### 3. State Agency Physicians

In a physical RFC assessment prepared on November 10, 2009, Dr. Knosp opined that Plaintiff can occasionally lift 20 pounds, frequently lift 10 pounds, and sit or stand for about 6 hours each in a normal workday (Tr. 319). He thought Plaintiff could occasionally climb stairs and perform balancing activities (Tr. 320) but should avoid concentrated exposure to extreme temperatures or wetness and even moderate exposure to hazards such as machinery and heights (Tr. 322). He disagreed with Dr. Schima's assessment of Plaintiff's limitations because Dr. Schima assumed that Plaintiff's MS symptoms would become progressively worse instead of improving with treatment. He also found no medical evidence to support Dr. Schima's opinion that Plaintiff's ability to handle objects is limited.  Dr. Knosp stated:

> Claimant's treating source, Dr. Schima, reports in a letter dated 10/14/09 that due to the claimant[']s gait difficulties, fatigue and visual problems he would have difficulties doing activities that involved walking, handling objects, working at heights or lifting and due to the progressive variant of the disease it sometimes will herald a poor prognosis. Dr. Schima concludes that he does not believe that the claimant will be able to return to work.

> MER [medical evidence of record] indicates that the claimant is beginning a treatment program with Rebif for his MS, with this medicaiton [*sic*] the claimant[']s limitations are expected to decrease. The claimant would likely have restriction in working at heights or climbing but the MER does not support any limitations on handling objects.

(Tr. 324).

Dr. Knosp examined all of Plaintiff's medical records and provided the following summary:

> The claimant is a 51 year old male that alleges multiple sclerosis and that he doesn't have the full use of the left side of his body. The claimant

-19-

reports on the ADL form that he is able to care for his personal needs, cooks, helps his wife with household chores, does outdoor chores with breaks and can drive an automatic vehicle. He reports that he is able to walk about 100 yards, can stand for about an hour, can navigate stairs with a handrail and can sit for about an hour before wanting to get up and stretch. The claimant was seen by his PCP on 7/16/09 for left arm and leg tingling that started a few days prior while he was riding in a truck. He reports the tingling lasted a couple hours, now his knee feels weak and still has tingling in his left arm. Records also indicate a history of a venous sinus thrombosis in brain 3/08 and an MRI at that time showed the possibility of MS. MRI of his brain was obtained on 7/17/09, it showed multiple white matter lesions suggesitve [*sic*] of a demyelinating plaques with interval development of three new white matter lesions with enhancement of the right ventrum semiovale plaque when compared to MRI from 3/08. He was seen at Bergan Mercy on 7/20/09 with increased weakness, neurological exam found cranial nerve 2-optic discs are flat, visual fields are full to finger cou[n]ting, CN 3, 4 and 6, pupils are 5 mm and react briskly to light, extraocular movements intact and the remained of the craninal [*sic*] nerves are intact. The claimant walked briskly but tended to circumduct the left leg, finger to nose and heel to knee were normal and he had motor weakness in the fine distributions. Thight [*sic*] flexion was 5/4+, knee flexion was 5/5, quads 5/5, anterior tibial 5/5- and toe extension was 5/4+. Rapid alternating movements were normal in the upper extremities and 0/-2 in the lower extremities. Reflexes were all 2/2 and sensation was intact to pin touch, position, abrasion, temperature and trace fingures *[sic]*. Clinical impression was MS, history of transverse and sigmoid sinus thrombosis by history and hypertension. Additiona[l] MRI's were obtained of the claimant[']s thoracic spine which only showed a tiny central disc protrusion at T8-9, otherwise unremarkable. MRI of lumbar spine only showed mild multilevel spondylosis and facet arthropathy and MRI of cervical spine showed multilevel cervical spondulosis with no significant central spinal canal compromise. Follow ups on 8/13/09 claimant continued to walk briskly with slight circumduction of the left leg, could walk on toes and heels but hoppins impaired on left foot. He was started on Solu Medrol 1 gm IV x 3 days. 8/27/09 follow up claimant reports that his left leg wants to "spring up", fatigue and difficulty with stairs. He was started on Provigil 150 mg. 9/3/09 reported

Provigil caused insomnia. Exam toe walking was -1/-1, heel walking was -2/-2, hopping is -1/-2 and thight [*sic*] flexion was 5/5-. His Provigil was reduced. 9/16/09 exam he reported gait difficulties, no falls but experiences "tunnel vision" and still is fatigued. His gait was brisk with a slightling widened base, impairment in toe walking and deel walking and difficulty hopping. Rapid movements were impaired in both feet but more so on the left. Treatment on Rebif will be started and he was referred to a neuroophtalmolgy [*sic*] eval. 9/22/09 claimant was examined by Robert Vandevort [*sic*], OD for blurry vision OU. Exam found some visual field defects OD, visual acuity is good OU with OD having a slightly sluggish pupil compared to OS. Also found some optic atrophy. The claimant[']s visual complaints appear to be releated [*sic*] to difference in VA OD due to optic nerve damage.

The claimant has recently been diagnosed with MS and is starting Rebif for therapy. The claimant reports limitations which are consistent with his diagnosis, he is considered credible. After the claimant begins therapy his limitions [*sic*] are expected to decrease. The claimant should have the ability to do work as it is outlined above in this RFC within a year of his AOD [alleged onset date].

(Tr. 325).

Six months later, in connection with the state agency's reconsideration of Plaintiff's claim, Dr. Higgins reviewed additional medical records and found that Plaintiff's physical condition had improved or at least stabilized with treatment. He concluded that Plaintiff's only environmental limitation was that he should avoid concentrated exposure to hazards such as machinery and heights (Tr. 362). Plaintiff's exertional and postural limitations were thought to be the same as before (Tr. 359-360). Dr. Higgins made the following notations concerning his review of Plaintiff's more recent medical records:

12/18/2009 clmt feels vision is good, but worse in heat. ROS is negative. OD 20/15-1, OS 20/15-1.

-21-

01/07/2010 muscle strength is 5/5 in all proximal muscles. Muscle tone and bulk is normal. Visual fields are full to confrontation. Sensation is normal in all extremities. Clmt is currently stable on Rebif therapy. 04/19/2010 clmt indicates headaches a couple of times a week. Clmt indicates some clumsiness and some weight loss. No indication of problems walking, back pain, joint pain, limited movement or weakness. There is less temporal loss OD today. VF defect has lessened or has a variable response. Visual fields are somewhat variable.

Prior RFC of 11/10/2009 indicated that a duration to light work by no later than 07/2010. Clmt appears to be currently capable of light types of work activities, as he has full strength and full sensation is all extremities. Clmt does not indicate any problems moving about in his most recent exam 04/2010. Clmt is capable of work activities as outlined in the RFC.

(Tr. 365).

"The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999)). However, "[w]hen faced with a conclusory opinion by a treating physician, the Commissioner need only come forth with 'some medical evidence' that the claimant can work. Residual functional capacity assessments by non-treating physicians can constitute the requisite substantial evidence." *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995) (citation omitted); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir.2002) (affirming ALJ's decision where ALJ "did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence."); *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995) ("Although it is true that the opinion of a reviewing physician alone does not constitute substantial evidence, the ALJ did not rely solely on the reviewing physicians in this case. The ALJ also conducted an independent analysis of the medical evidence.").

-22-

### B. Plaintiff's Credibility

To assess a claimant's credibility, the ALJ must consider all of the evidence, including prior work records and observations by third parties and doctors regarding daily activities, the duration, frequency, and intensity of pain, precipitating and aggravating factors, the dosage, effectiveness, and side effects of medication, and functional restrictions. *Lowe v. Apfel*, 226 F.3d 969, 971-72 (8th Cir. 2000) (citing *Polaski v. Heckler*, 739 F.3d 1320, 1322 (8th Cir. 1984)). Where adequately explained and supported, credibility findings are for the ALJ to make. *Id* at 972. (citing *Tang v. Apfel*, 205 F.3d 1084, 1087 (8th Cir.2000)). The court must "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (quoting *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)); *see also Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

The ALJ explained that she found Plaintiff's testimony not fully credible for several reasons, including inconsistencies between these complaints and Plaintiff's daily activities, a gap in Plaintiff's treatment, and the fact that treatment records and objective evidence failed to support Plaintiff's testimony (Tr. 14, 15, 16). The ALJ has provided good reasons for her credibility findings and there is substantial evidence to support them. *See, e.g., Medhaug v. Astrue*, 578 F.3d 805, 816 (8th Cir. 2009) (ALJ properly considered that claimant's back pain responded to medical treatment and that he maintained activities of daily living with minimal accommodations).

The ALJ found that Plaintiff's daily activities were not as limited as one would expect in view of Plaintiff's testimony (Tr. 16). Inconsistencies between a claimant's daily activities and his reported limitations detract from the claimant's credibility. *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) ("There is . . . substantial evidence for the ALJ's observation that Steed's reported daily activities were inconsistent with

her self-reported limitations."); 20 C.F.R. § 404.1529(c)(3)(i) (ALJ must consider claimant's "daily activities" when evaluating symptoms). In this case, the ALJ noted that Plaintiff's daily activities included going out to his shop to perform odd jobs, helping with household chores and yard work, going to the store, visiting friends or his girlfriend's mother, and playing chess on the computer (Tr. 16, 42, 53–58, 62, 66–67, 205, 207). The ALJ also considered Plaintiff's testimony that he went on a vacation with his son (Tr. 66). Plaintiff's activities are similar to the kinds of activities the Eighth Circuit has judged to be inconsistent with disabling symptoms.[7] Plaintiff's ability to drive, complete woodworking projects, help with household chores, and go shopping do not support his testimony about limited vision, severe walking restrictions, and poor hand coordination (Tr. 70, 71-72).

A significant gap in Plaintiff's treatment also influenced the ALJ's credibility finding (Tr. 15). A claimant's allegations may be discredited by evidence that the claimant has received minimal treatment compared to symptoms he alleges. See *Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) (upholding an ALJ's determination a claimant lacked credibility due in part to "absence of hospitalizations ... , limited treatment of symptoms, [and] failure to diligently seek medical care"); 20 C.F.R. § 404.1529(c)(3)(v) (the agency will consider the claimant's treatment when evaluating her symptoms). The ALJ found it significant that Plaintiff did not receive any treatment for multiple sclerosis after September 2010 (Tr. 15). The fact that Plaintiff did not require any medical treatment during the six-month period before the hearing

---

[7] *See, e.g.,* *McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) (finding that claimant's reports that he gardened, drove, and helped his children get ready for school were inconsistent with allegations of disabling pain); *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for eleven-year-old child, driving, fixing simple meals, doing housework, and shopping for groceries held to be "extensive daily activities" that did not support claimant's alleged inability to work).

cast doubt on his testimony about being housebound for days at time due to treatment side effects.

When Plaintiff did pursue treatment, the medical records do not document the degree of symptoms he alleged at the hearing (Tr. 15, 16). For example, the ALJ noted that Plaintiff reported no relapses during an April 2010 appointment (Tr. 15, 352). The ALJ also noted that Plaintiff reported doing very well during a September 2010 appointment with Dr. Rivett (Tr. 15, 410), and during his last eye appointment with Dr. Vandervort, Plaintiff said that his vision was good (Tr. 332).

The ALJ also found that Plaintiff's testimony about his symptoms conflicted with the objective evidence in the record (Tr. 16). Although an ALJ may not reject a claimant's subjective complaints solely for lack of objective medical evidence, an ALJ is entitled to make a factual determination that a claimant's subjective complaints are not credible in light of objective medical evidence to the contrary. *See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); 20 C.F.R. § 404.1529(c)(2)* (objective medical evidence considered when evaluating symptoms). As the ALJ observed, Plaintiff had full motor strength and normal muscle tone during Dr. Bremer's September 2010 neurology examination (Tr. 15, 411). Likewise, during an earlier neurologic examination, Dr. Schima found that Plaintiff "walked briskly on a normal base," could walk on his heels and toes, and had normal muscle strength aside from "5/5-" strength during thigh flexion (Tr. 431). Although objective evidence pointed to some physical limitations, it also showed that Plaintiff retained significant strength and mobility.

### C. "Step Five" Determination

Finally, Plaintiff contends the ALJ erred at step five by posing a hypothetical question to the vocational expert that did not include all of his physical limitations. *See Cox v. Astrue, 495 F.3d 614, 620 (8th Cir. 2007)* ("Testimony from a vocational expert is substantial evidence only when the testimony is based on a correctly phrased

hypothetical question that captures the concrete consequences of a claimant's deficiencies.") However, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise v. Astrue*, 641 F.3d 909, 927 (8th Cir. 2011) (quoting *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006)). "The ALJ's hypothetical question included all of [Plaintiff's] limitations found to exist by the ALJ and set forth in the ALJ's description of [Plaintiff's] RFC." *Id.* Because "the ALJ's findings of [Plaintiff's] RFC are supported by substantial evidence, ... [t]he hypothetical question was therefore proper, and the VE's answer constituted substantial evidence supporting the Commissioner's denial of benefits." *Id.* (quoting *Lacroix*, 465 F.3d at 889).

## *IV. CONCLUSION*

For the reasons explained above, I find the ALJ's decision is supported by substantial evidence on the record as a whole and is not contrary to law.  Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed pursuant to sentence four of 42 U.S.C. § 405(g).  Final judgment will be entered by separate document.

January 22, 2014.                                BY THE COURT:

*Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.